UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| **EVONNE THOMAS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:06-CV-00411** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Evonne Thomas appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[2] (*See* Docket # 1.)  Thomas filed her opening brief on April 13, 2007, and after receiving an extension of time, the Commissioner filed its response on June 27, 2007. (Docket # 11-14.)  Thomas failed to file a reply brief, and the time for her to do so has since expired.  For the following reasons, the Commissioner's decision will be AFFIRMED.

**I.  PROCEDURAL HISTORY**

Thomas applied for DIB and SSI on January 14, 2003, alleging that she became disabled as of October 15, 1990. (Tr. 57.)  The Commissioner denied her application initially and upon

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

reconsideration, and Thomas requested an administrative hearing. (Tr. 39-41, 47-54, 230.) On October 27, 2004, Administrative Law Judge (ALJ) Thomas Piliero held a hearing and granted Thomas a continuance of the hearing so that she could obtain legal counsel; however, Thomas failed to do so. (Tr. 291-96.)

The ALJ then continued the hearing on December 12, 2005, at which Thomas, who was unrepresented, and a vocational expert testified. (Tr. 297-336.) On April 27, 2006, the ALJ rendered an unfavorable decision to Thomas, concluding that she was not disabled despite the limitations caused by her impairments because she could perform her past relevant work, as well as a significant number of other jobs in the economy. (Tr. 14-25.) One month after the ALJ issued his decision, Thomas secured counsel to represent her. (Tr. 282-84.)

On October 24, 2006, the Appeals Council denied Thomas's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 6-8.) Thomas filed a complaint with this Court on December 27, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II.  THOMAS'S ARGUMENTS

Thomas alleges four flaws with the Commissioner's final decision. Specifically, Thomas claims that: (1) substantial evidence does not support the ALJ's conclusion that her IQ scores were invalid; (2) the ALJ failed to properly consider and discuss the listing for mental retardation; (3) her waiver of the right to counsel was invalid; and (4) the ALJ failed to fully and fairly develop the record. (Plaintiff's Statement of Errors at 1.)

2

### III.  FACTUAL BACKGROUND[3]

*A.  Background*

At the time of the ALJ's decision, Thomas was forty-five years old, had a high school education and had attended some college classes, and possessed work experience as a nurse's assistant and telemarketer. (Tr. 14, 57, 67, 71, 101.)  Thomas stated that she became disabled as of October 15, 1990, as a result of manic depression, asthma, bronchitis, back pain, and psychotic symptoms. (Tr. 61.)

At the hearing, Thomas testified that she had been living alone in an apartment for the past year. (Tr. 303.)  Prior to that she spent several years in prison for forgery; Thomas also stayed with her mother intermittently over the years whenever she would quit or lose a job. (Tr. 185, 308.)  She reported that she is able to drive but does not do so because she does not have a car. (Tr. 304.)  To support herself, Thomas stated that she receives food stamps and works approximately sixteen hours per week as a nurse's assistant. (Tr. 308-09.)  When asked why she can work part-time but not full-time, Thomas replied: "I think it's due to my impairments because . . . I act out at times when I try to work full time." (Tr. 310.)  Thomas reported that she enjoys reading, talking, singing, and playing cards in her leisure time. (Tr. 328; *see also* Tr. 185.)

Thomas testified that in her job as a nurse's assistant she regularly feeds, positions, transfers, and bathes patients, and occasionally checks their vital signs. (Tr. 311.)  She further explained that to obtain her certification as a nurse's assistant in 1990, she completed a two-month training class and passed a "state board test." (Tr. 311.)  She also reported that she has

---

[3] The administrative record in this case is voluminous (336 pages), and the parties' disputes involve only portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

taken "a semester or less" of college but emphasized that she "never completed [it]," which she attributed to "anxiety or not [being] able to complete a task." (Tr. 328-29.)  When asked by the ALJ whether she had any difficulty with reading, writing, or doing simple math, Thomas responded: "Well, at times but overall, no.  At times I do." (Tr. 305.)

Thomas also testified that she smokes about one-half pack of cigarettes a day but that she does not drink alcohol. (Tr. 305.)  She confided that she used cocaine and marijuana "years ago" but that she had not used illegal drugs for "[o]ver a year." (Tr. 306.)  She credited her recovery to her participation in Alcoholics Anonymous and Narcotics Anonymous programs. (Tr. 307.)

Thomas also confided that she does not like taking medication unless she "absolutely ha[s] to." (Tr. 326.)  She stated that she was placed on Celexa for her depression but that she was not able to keep taking it due to her financial situation. (Tr. 326.)  When asked what she was doing for her anxiety and depression, Thomas testified that she just "tr[ies] to keep [her]self busy," as she cannot afford any medicine. (Tr. 327.)

On February 18, 2003, an agency claims examiner documented that Thomas missed two examinations that were scheduled for her. (Tr. 188-90.)  Upon confrontation about the missed appointments, the examiner noted that Thomas was "extremely belligerent," stating: "I know how this works, you've got to reschedule me twice." (*Id.*)  Thomas also told the examiner during the conversation that she went grocery shopping several times each week and drove to run errands. (*Id.*)  One month later, Thomas asked the agency examiner how much she could work and still be eligible for disability benefits. (Tr. 190.)  She confided that she had interviewed for a nurse's assistant job at a nursing home and that she may try to get a job as a telemarketer because she could do that work fairly easily. (*Id.*)  Finally, the examiner noted that Thomas's

4

"story changed nearly every two minutes" when probed about the frequency of her asthma symptoms or her shortness of breath. (*Id*.)

On October 8, 2003, an agency claims examiner asked Thomas about her current impairments and treatment, including her asthma. (Tr. 101.) Thomas was reluctant to answer, emphasizing: "I'm not disabled because of asthma. I want SSI because I take Celexa." (*Id*.) She further stated: "I've been filing for SSI since the 1990's and people like me don't give up until we get it." (*Id*.) The claims examiner also noted that at the time Thomas was taking two English classes at Indiana University Purdue University Fort Wayne and was working as a nurse's assistant approximately twenty hours a week. (*Id*.)

### B. *Summary of the Relevant Medical Evidence*

In this appeal, Thomas does not dispute the ALJ's findings regarding her physical impairments; rather, she raises issues with respect to the ALJ's consideration of her mental impairments, specifically her intelligence. Thus, the Court will focus on the evidence concerning Thomas's mental condition.

On February 20, 1995, Thomas was admitted to the Lutheran Behavioral Health Institute Chemical Dependency Program due to a relapse of her crack cocaine addiction. (Tr. 142-44.) Upon admission, she stated that she was using crack on a daily basis though she was working as a nurse's assistant at the time. (*Id*.)

On March 13, 2003, W. Von Bargen, Ph.D., performed a mental status examination on Thomas at the request of the state agency. (Tr. 185-87.) He noted that Thomas was cooperative and spoke freely, although her speech was somewhat pressured and rambling. (*Id*.) Thomas told Dr. Von Bargen that she went occasionally to Narcotics Anonymous and enjoyed singing and

playing cards. (*Id*.)  She stated that she was contemplating going to college to pursue studies in a medical field but that she had tried several times and not succeeded. (*Id*.)  Dr. Von Bargen noted that though Thomas was somewhat vague about her current use of cocaine, her responses suggested that she currently uses cocaine on a "less frequent basis than her previous level." (*Id*.)  He also noted that her relationships with others appeared to be quite poor and were marked by irritability and conflict and that she would likely benefit from assistance in the management of her funds. (*Id*.)  He assigned her a diagnosis of bipolar disorder, schizoaffective disorder, and cocaine abuse. (*Id*.)

     A few days later, D. Unversaw, Ph.D., a state agency psychologist, reviewed Thomas's medical record and concluded that Thomas had a substance abuse disorder that was not severe and that caused only mild limitations in her activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, and pace. (Tr. 194-206.)  In addition, Dr. Unversaw opined that Thomas "is <u>not</u> credible," observing that she changed her stories and allegations throughout the application process. (*Id*.)  He further noted: "She is manipulative, seems to know how to 'play the system.'" (*Id*.)  Dr. Unversaw concluded that the medical evidence of record did not suggest that Thomas has a bipolar disorder. (*Id*.)  Dr. Unversaw's opinion was affirmed seven months later by another state agency psychologist. (*Id*.)

     On August 18, 2005, T. Rodney Swearingen, Ph.D., performed a psychological evaluation of Thomas at the request of the state agency. (Tr. 249-57.)  Thomas told Dr. Swearingen that she lived alone; completed most of her daily activities independently; worked four hours per day at a cleaning job; and cleaned, cooked, and shopped with her neighbor. (*Id*.)

6

She also stated that she had taken some college classes, commenting that she earned average grades and enjoyed certain aspects of school. (*Id.*)  She denied having any problems with following instructions at work, though she did note some difficulty with repetitive tasks. (*Id.*)

Dr. Swearingen noted that Thomas was cooperative and not impulsive and that she had no unusual behaviors. (*Id.*)  She spoke in a direct voice with no flight of ideas, she had no perseveration of thought, her associations were well organized although sometimes circumstantial, and her speech was clear and understandable. (*Id.*)  Her affect was constricted, her mood was mildly dysphoric, she complained of mood swings, and she had occasional suicidal ideation and thoughts of hurting others but with no plan. (*Id.*)  She also had anxiety, occasional hallucinations, obsessions, and compulsions, and her immediate memory skills were impaired. (*Id.*)  In addition, she was oriented, her word knowledge was average, her verbal concepts were borderline, her concentration and persistence were fair, she maintained an average pace, and she had no difficulty with following or understanding directions. (*Id.*)  Thomas's social judgment and comprehension ability as measured on intelligence testing were below average. (*Id.*)

In connection with Dr. Swearingen's evaluation, Thomas underwent various psychological tests including the WAIS-III, which revealed a verbal IQ of seventy (borderline), performance IQ of 58 (impaired), and full scale IQ of 62 (impaired). (*Id.*)  Dr. Swearingen opined that "[c]hances are 95 out of 100 that upon subsequent administration of the this test, the claimant would validly obtain a Full Scale IQ score between 59 and 67." (*Id.*)  WRAT-3 testing indicated that Thomas's reading skills were at the seventh grade level. (*Id.*)  Memory testing showed results in the borderline and impaired range. (*Id.*)  However, the results of Thomas's

7

MMPI-2 revealed an invalid personality protocol because of "an extreme number of item endorsements." (*Id.*)  Dr. Swearingen assigned a diagnosis of dysthymic disorder, alcohol dependence, and borderline intellectual functioning. (*Id.*)  He also opined that Thomas was moderately impaired in relating to other people; moderately impaired in understanding, remembering, and following directions; mildly impaired in maintaining attention and concentration; and mildly impaired in withstanding stress and pressure related to work. (*Id.*)

Dr. Swearingen also completed a medical source statement concerning Thomas's ability to do mental work-related activities. (*Id.*)  Here, he noted that she had a slight impairment in understanding, remembering, and carrying out short, simple instructions; a slight impairment in interacting appropriately with the public and in responding appropriately to work pressures; and a moderate impairment in interacting with coworkers and supervisors and in responding to changes in routine work setting. (*Id.*)

On August 24, 2005, Dr. David Sharkis examined Thomas at the request of the state agency. (Tr. 258-59.)  He concluded that there was little objective evidence to support any restrictions in sitting, walking, lifting, carrying, handling objects, speaking, or traveling. (*Id.*)  In addition, Dr. Sharkis noted that Thomas's pulmonary function studies were normal. (Tr. 263.)

### IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind

8

might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

9

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On April 27, 2006, the ALJ rendered his opinion. (Tr. 14-25.) He found at step one of the five-step analysis that Thomas had engaged in some substantial gainful activity since her alleged onset date of October 15, 1990, but nonetheless stated that "the determination in this case will be based on the remaining steps in the disability determination process." (*Id.*) The ALJ proceeded to step two where he concluded that her history of drug and alcohol dependence, asthma (with related tobacco use addiction), and affective disorder were severe. (*Id.*) At step three, he determined that Thomas's impairment or combination of impairments were not severe enough to meet a listing. (*Id.*) Before proceeding to step four, the ALJ determined that Thomas's testimony of debilitating limitations was not credible and that she had the RFC to perform work activity that is not fast paced and that does not expose her to air pollutants. (*Id.*)

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

10

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Thomas could perform her past relevant work as a nurse's assistant or telemarketer. (*Id.*)  In addition, the ALJ proceeded to step five where he determined that Thomas could also perform a significant number of other jobs within the national economy. (*Id.*)  Therefore, Thomas's claim for DIB and SSI was denied. (*Id.*)

### C.  Substantial Evidence Supports the ALJ's Finding That Thomas's IQ Scores Were Invalid

Thomas first argues that the ALJ improperly determined that her IQ scores were "invalid," asserting that this is significant because her IQ scores offer evidence that she meets a listing for mental retardation.  Contrary to Thomas's argument, the ALJ's conclusion is supported by substantial evidence.

To elaborate, in his decision the ALJ noted the results of Thomas's WAIS-III, which indicated that she had a verbal IQ of seventy, a performance IQ of fifty-eight, and a full scale IQ of sixty-two.  The ALJ also considered Dr. Swearingen's statement that "[c]hances are 95 out of 100" that Thomas would score between fifty-nine and sixty-seven upon subsequent administrations of the test. (Tr. 252.)  However, after considering Dr. Swearingen's evidence in light of the rest of the record, the ALJ concluded that Thomas's IQ scores were invalid, explaining that they were inconsistent with her education, work experience, and activities of daily living. (Tr. 20.)  Specifically, he noted that Thomas reported that she received average grades while taking college-level courses; is literate; understands basic math; drives a car; works as a nurse's assistant where she is responsible for caring for patients; and pursues various leisure interests. (*Id.*)

11

Indeed, the Seventh Circuit Court of Appeals has stated that an ALJ must "include a discussion of whether or not obtained IQ scores are considered valid and consistent with the individual's developmental history and degree of functional restriction." *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)). In *Maggard*, the ALJ concluded that the claimant's IQ scores were invalid, noting that the testing psychiatrist assigned a diagnosis of borderline intellectual functioning rather than mental retardation; another examining psychiatrist found no evidence of mental retardation; the claimant admitted he had been drinking on the eve of the test and had not eaten; and the record indicated that the claimant was able to relate to fellow workers and supervisors, understand and follow directions, maintain the attention required to perform simple repetitive tasks, and withstand the stress and pleasures associated with a day-to-day work activity. *Id.* Based on this evidence, the Appeals Court affirmed the ALJ's conclusion that the IQ scores were invalid. *Id.* at 381.

The instant circumstances are similar to those presented in *Maggard*. Despite Thomas's performance and full scale IQ scores in the "impaired" range, Dr. Swearingen assigned her a diagnosis of borderline intellectual functioning, *not* mental retardation. Moreover, as the ALJ noted, Dr. Swearingen observed that Thomas was able to maintain an average pace, that her concentration and persistence were fair, that she was able to follow and understand directions, and that she was able to live independently. Furthermore, no other medical source of record found evidence of mental retardation, including Dr. Von Bargen, another examining psychologist. Indeed, as the ALJ properly observed, the record is replete with evidence of Thomas's functional abilities that are seemingly inconsistent with her performance and full scale IQ scores, including, most notably, that she graduated from high school and required no special

12

classes; reported receiving average grades in college classes; passed her two-month training course to achieve her certification as a nurse's assistant; and worked as a nurse's assistant where she was responsible for the care of patients, including occasional monitoring of their vital signs.

Clearly, the ALJ built an accurate and logical bridge between the evidence and his conclusion that Thomas's IQ scores were invalid, considering the important evidence of record and allowing this Court to easily track his reasoning.[5] *See Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Thus, Thomas's first argument in pursuit of remand is unavailing.

### D. The ALJ Did Not Err at Step Three When Finding That Thomas Did Not Meet or Equal a Mental Retardation Listing

Next, Thomas argues that the ALJ erred at step three by not finding that she met the requirements of Listing 12.05(C) and by failing to specifically mention Listing 12.05(B). Again, Thomas's argument fails to warrant a remand of the Commissioner's final decision, as substantial evidence supports the ALJ's finding that Thomas did not meet or equal a listing for mental retardation.

The introduction to the mental impairment listings states: "If your impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 12.00A (emphasis added); *see also Mendez*, 439 F.3d at 362; *Blakes ex rel. Wolfe v. Barnhart*,

---

[5] Moreover, even if Thomas's first argument was successful, it would ultimately be of no import. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination). As will be discussed *infra*, regardless of her IQ scores Thomas fails to satisfy other requirements of the listing for mental retardation. *See Adkins v. Astrue*, 226 F. App'x 600, 605 (7th Cir. 2007) ("Although low IQ scores are indicative of retardation, other factors, such as the claimant's life activities and employment history, must be considered and weighed and properly play into the ALJ's analysis." (citing *Mendez v. Barnhart*, 439 F.3d 360, 361 (7th Cir. 2006); *Maggard*, 167 F.3d at 380)).

331 F.2d 565, 579 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595 n.6 (7th Cir. 2003). Specifically, the diagnostic description set forth in Listing 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt P, App. 1 § 12.05.  Thus, Thomas must satisfy the requirements of this diagnostic description *in addition to* the specific requirements articulated in Listing 12.05C or 12.05B.  In that vein, Listing 12.05C specifically requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function," and Listing 12.05B requires evidence of a "valid verbal, performance, or full scale IQ of 59 or less." *Id*.

In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must "discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *see also Scott*, 297 F.3d at 595-96.  Here, at step three the ALJ specifically discussed Listing 12.04 (depression), Listing 12.05C (mental retardation), and Listing 12.06 (anxiety).  In fact, at step three the ALJ penned ten paragraphs on the medical evidence (including Dr. Swearingen's opinion) and Thomas's functional abilities, which the ALJ concluded were only mildly impaired. (*See* Tr. 21-22.)  After this discussion of the medical evidence and Thomas's level of adaptive functioning, the ALJ summarized: "The claimant's actual level of intellectual functioning is inconsistent with the requirements of § 12.05C, which addresses mental retardation.  As summarized under Step 2 above, I find that her IQ scores were invalid.  Indeed, she reported that she received average grades while taking college-level courses." (Tr. 22 (citation omitted).)

14

Thus, the ALJ specifically discussed Listing 12.05C in more than a perfunctory manner and properly concluded that Thomas did not meet its requirements, observing that she did not have a valid full scale IQ of sixty to seventy nor any significant limitations in her functional abilities. Though the ALJ did not specifically mention Listing 12.05B, the ALJ's reasoning with respect to this listing is transparent – that is, that Thomas did not meet its requirements because she lacked a valid IQ score of fifty-nine or less. *See Barnett*, 381 F.3d at 668 (inferring from the ALJ's written decision that he correctly recognized the applicability of the relevant listing for nonconvulsive epilepsy though the ALJ never specifically identified it by name); *see generally Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."); *cf. Scott*, 297 F.3d at 595-96 (remanding the case where the ALJ failed to discuss or even reference the relevant listing, leaving the court "with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing"). Moreover, the record is void of any evidence that suggests Thomas satisfies the diagnostic description in the introductory paragraph of Listing 12.05 in order to qualify for *either* Listing 12.05C or 12.05B.

Furthermore, in rendering his opinion, the ALJ relied upon the assessment of the state agency psychologists (Tr. 21), who concluded that Thomas's mental impairment did not meet or equal a listing. To explain, the state agency physicians completed Disability Determination and Transmittal forms at the initial and reconsideration levels and concluded that Thomas was not disabled. (Tr. 39-41.) The Seventh Circuit Court of Appeals has articulated that "[t]hese forms conclusively establish that consideration by a physician . . . designated by the Commissioner has

15

been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (internal quotation marks and citations omitted). Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id*. (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p.

Thus, Thomas's argument that the ALJ erred at step three by not finding that she met the requirements of Listing 12.05C and by failing to specifically mention Listing 12.05B is simply unavailing.

### E. The Invalidity of Thomas's Waiver of the Right to Counsel Does Not Warrant a Remand Because the ALJ Fully and Fairly Developed the Record

Next, Thomas contends that her waiver of the right to counsel was invalid. Indeed, the Commissioner concedes this point, acknowledging that the ALJ failed to explain a required component of the waiver – that is, that the limitation on attorney fees is twenty-five percent of any past due benefits and that the court's approval of the fees is required.[6] *See Binion*, 13 F.3d at 245 (concluding that the claimant's waiver was invalid because, though the ALJ provided the rest of the required notice, the ALJ failed to explain the twenty-five percent cap to the claimant).

The Commissioner, however, contends that this deficiency is mere harmless error because Thomas was not prejudiced by the lack of counsel. (Mem. in Supp. of the Commissioner's Decision at 15.) More particularly, the Commissioner argues that the ALJ fully and fairly developed the record, which accelerates us to Thomas's final argument – that the ALJ

---

[6] To ensure a valid waiver, the ALJ must explain to a *pro se* claimant "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of fees." *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994).

16

erred by failing to fully and fairly develop the record.

"Where the disability benefits claimant is unassisted by counsel, the ALJ has a duty to scrupulously and conscientiously . . . probe into, inquire of and explore for all the relevant facts . . . ." *Binion*, 13 F.3d at 245 (quoting *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)).  Because Thomas's waiver of counsel was invalid, the burden is on the Commissioner in this circumstance to show that the ALJ adequately developed the record. *Id.*; *see also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

During the fifty-minute hearing, the ALJ asked Thomas why she thought she was disabled. (Tr. 321.)  Thomas then extensively described her impairments, including her alcohol and drug use, asthma, bronchitis, anxiety, and depression. (Tr. 321-29; *see also* Tr. 306-08.) After probing into her various impairments, the ALJ asked Thomas: "Is there anything else you think I need to know?"; Thomas responded, "I guess not." (Tr. 329.)  The ALJ also extensively inquired into Thomas's educational and occupational history, noting that she was currently working as a nurse's assistant four days a week; he then probed into what specific duties Thomas performed on the job. (Tr. 304-05, 309-21, 328-29.)  He also inquired about her use of medication for her symptoms and her ability to drive a car. (Tr. 304, 322-23, 326-27.)  Simply, the ALJ fully and fairly developed the record at the hearing, and Thomas's contention that the ALJ failed to adequately develop her testimony with respect to her physical limitations, her activities of daily living, and the effects of her depression and anxiety amounts to no more than nitpicking at the ALJ's interview of her at the hearing. *See generally Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (stating that when reviewing an ALJ's decision, a court will "give the opinion a commonsensical reading rather than nitpicking at it" (citation omitted)).

17

Similarly, Thomas's claim that the ALJ failed to properly develop the claims file is also unfounded, as her challenges to the record amount to mere nits.  For example, Thomas criticizes the ALJ for failing to obtain her employment records; yet, the record contains Thomas's earnings record for the relevant period. (*See* Tr. 237-42.)  Likewise, while Thomas contends the ALJ failed to develop the record by ordering additional consultative psychological testing, she neglects to mention that after the initial hearing in October 2004 the ALJ sent her for consultative psychological and physical examinations.  The examinations were completed in August 2005 (Tr. 249-74), and the ALJ considered the results of these examinations in his April 2006 decision. (Tr. 14-15.)

Thomas further criticizes the ALJ because the Rockwell Correction Facility did not respond to a request for her medical records from 1996 and 1998; however, the ALJ explained at the hearing that these records concern a time period "beyond what we're really concerned with," concluding at the onset of the hearing that Thomas was not eligible for DIB or SSI prior to 2000 because of her earnings record. (Tr. 301, 303.)  Moreover, when Thomas and the ALJ deduced at the hearing that certain notes from "Dr. Joe Ashen" were not in the record, Thomas stated twice that she had the records at home and would send a copy to the ALJ, who agreed to hold the record open for one week; Thomas, however, never submitted the records. (Tr. 324.)

Furthermore, Thomas has declined to rebut the Commissioner's showing that the ALJ fully and fairly developed the record by demonstrating how she was prejudiced by any alleged evidentiary gap in the record. *See Binion*, 13 F.3d at 245-46 ("Once the Secretary establishes that the record was developed fully and fairly, the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap.").  "Prejudice may be demonstrated by

18

showing that the ALJ failed to elicit all of the relevant information from the claimant." *Id*.  In that vein, "a significant omission is usually required before this court will find that the Secretary failed to assist *pro so* claimants in developing the record fully and fairly." *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994).  "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) (quoting *Binion*, 13 F.3d at 246).  Here, Thomas fails to specifically identify any evidence that the ALJ failed to elicit that would make a difference in the outcome of this case.

Moreover, on May 31, 2006, one month after the ALJ issued his decision, Thomas obtained an attorney to represent her. (*See* Tr. 282-84.)  Two months later, the Appeals Council sent Thomas's attorney a letter, providing her with the recording of the hearing that she requested and affording her twenty-five days to submit additional evidence to the record. (Tr. 11-12.)  Thomas's attorney, however, never submitted additional evidence to the Appeals Council or requested additional time within which to do so.  Indeed, a claimant who is represented by counsel is assumed to have advanced her "strongest case for benefits." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).

In sum, though Thomas's waiver of the right to an attorney was invalid, it amounts to no more than harmless error, *see Shramek*, 226 F.3d at 814, as the ALJ fully and fairly developed the record, exploring all the relevant facts. *See Binion*, 13 F.3d at 246.  Consequently, Thomas's final argument fails to warrant a remand of the Commissioner's final decision, and therefore the Commissioner's decision will be affirmed.

19

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Thomas.

SO ORDERED.

Enter for this 30th day of August, 2007.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
